**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.: 0:13-cv-62232

| | |
|---|---|
| D.M. | ) |
| | ) |
|     *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| YOUTH SERVICES INTERNATIONAL, INC. | ) |
| JFS HOLDING, LLC, | ) |
| CHRISTOPHER SLATTERY, | ) |
| MICHAEL SLATTERY, and | ) |
| JAMES SLATTERY | ) |
| | ) |
|     *Defendants.* | ) |

**COMPLAINT**

1.      This is a civil rights action filed pursuant to 42 U.S.C. § 1983 to bring justice for

Plaintiff D.M., a victim of the family run, for-profit juvenile prison corporation, Youth Services

International, Inc. ("YSI").

<u>Introduction</u>

2.      This action concerns Youth Service International, Inc. and its Officers' decision to

act with willful blindness towards a sexual predator in their employ, the Administrator at

Thompson Academy.

3.      This specific action concerns the Administrator of Thompson Academy molesting

a simple boy, and YSI's knowledge and silent approval, and their conscious decision to not act

despite numerous warnings prior to D.M.'s incarceration and after D.M. left the facility.

4.      The Administrator of Thompson Academy, on a routine basis brought boys to his

office late at night where he would touch them, feed them, photograph them, dress them, take

them on secret car rides by exiting through his office's private unalarmed side door, give the boys

1

gifts and take them shopping, and at least on one occasion, he brought boys, including DM, to a townhouse.

5.      Youth confined at Thompson Academy, with reckless abandon by Defendants, were knowingly and continuously exposed to the Administrator who was developing his grooming technique, as sexual predators do, and initiated several highly inappropriate relationships with extremely troubled youth.

6.      The Administrator's behavior received an implicit seal of approval from YSI and its officers when he was allowed to fire the facility's current management team and replace it with employees loyal to him, and he was allowed to act with impunity and no oversight.

7.      The Administrator received further validation his behavior was acceptable when Kamel Warren provided written notice in an EEOC complaint that the Administrator took children home with him - and Vice Presidents Michael and Christopher Slattery did not even investigate the allegation, let alone report it to the State as they were mandated.

8.      YSI's negligence of their duty to supervise, train, hire, investigate and retain resulted in:

    a.   Molestation and abuse at Thompson Academy;

    b.   The creation of an unsafe environment for youth and staff;

    c.   An environment where youth were empowered over staff;

    d.   A culture where failure to report was the norm and corporate expectation;

    e.   A failure to provide staff with mandated training;

    f.   An epidemic of document fraud throughout the facility;

    g.   An environment where staff were afraid to report issues they were mandated to report;

2

h.  Widespread nepotism in the hiring of staff, (from the corporate level to the facility level);

i.  The termination of all managers and staff who were viewed as leaders within the facility and posed a threat to Ferguson's authority;

j.  Youth locked in isolation and deprived of education, recreation, and social activities for extended periods of time;

k.  The facility's most troubled youth being given extreme privilege to buy their compliance and not cause problems within the facility.

9.  Prior to receiving actual notice in October 2011 of the Administrator taking boys home with him, YSI was aware of multiple incidents that constitute constructive notice that they had a duty to train, supervise, and investigate the Administrator including:

a.  Prior to being hired, his failure, twice, to divulge information to Georgia DJJ about a job he had working with teenagers early in his career - and then his differing explanations as to why the information was omitted;

b.  Upon beginning his tenure, the Administrator required newly admitted youth to sleep on the floor until he decided the youth should receive a bed;

c.  Discipline broke down, and staff became indistinguishable from youth at facility within two months of the Administrator being on the job;

d.  Within three months of the Administrator being on the job, a youth reported sexual assault to staff, staff stated in sworn testimony to the OIG and Pembroke Pines Police Department that gave reports of the assault to the Administrator, but nothing was reported to the State at the time, and the then upon investigation by the State, the reports to the Administrator

3

disappeared, and then never existed. Staff were not followed up with by Corporate regarding the missing reports;

e.  The Administrator developed inappropriate relationships with several light-skinned, muscular, and toned male staff and youth that affected the performance and staffing ratios of the facility;

f.  The Administrator purchased gifts for youth to use and wear in the facility, including shoes, necklaces, deodorant, cologne, and in one instance, an iPod preloaded with Beyonce and other artists enjoyed by an effeminate youth; and

g.  A complete lack of any training hours on any employee's pay records.

10.    YSI's negligent and willful conscious decisions to do nothing when faced with a sexual predator in one of their facilities lead to the molestation and abuse of young, already troubled boys, including D.M..

11.    DJJ-contracted facilities are operated at a high cost to Florida taxpayers, who have paid up to $74 million to YSI.

12.    Administrators are motivated by financial benchmarks and YSI's corporate culture is focused primarily on cutting expenses, not providing for the wellbeing of youth in their care.

13.    YSI has operated with a corporate atmosphere that put profits ahead of the safety, security and success of the youth that were entrusted to YSI.

14.    Plaintiff, D.M., individually and on behalf of all youth who are now confined or who will in the future be confined at YSI facilities, seeks declaratory, preliminary, and permanent injunctive relief requiring that the Defendants cease their unlawful policies and practices.

15.     On behalf of himself, Plaintiff D.M. seeks declaratory relief, compensatory, punitive damages, and attorney fees.

## PARTIES

16.     Plaintiff, D.M., is now an adult male individual, a citizen and resident of the State of Florida. The identity of the Plaintiff is not pleaded in this Complaint in order to protect the identity of the Plaintiff because the Plaintiff was a minor when exposed to YSI.  D.M. has borderline intellectual functioning.  D.M. has a history of poor impulse control, poor decision making skills and conduct disorder.  D.M.'s I.Q. falls between 60-75.  The identity of the Plaintiff has been made known to the Defendants by separate communication.  D.M. is an extremely troubled youth, and during his time at Thompson Academy, he was in at least 6 physical altercations with other youth and staff, including the physical assault of another youth while in class.

17.     Defendant Youth Services International, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business at 6000 Cattleridge Drive, Suite 200, Sarasota, Florida 34232, and is in the business of operating juvenile residential correctional, commitment and rehabilitative facilities in Florida and elsewhere.  YSI provides services in Florida through contracts with the Florida Department of Juvenile Justice (hereinafter also referred to as "DJJ"), a department and agency of the State of Florida.

18.     YSI has contracted with the Florida Department of Juvenile Justice, to run multiple facilities.  Eight (8) facilities are currently operated by YSI in Florida: 1) Broward Youth Treatment Center in Pembroke Pines; 2) Broward Girls Academy in Pembroke Pines; 3) Palm Beach Regional Correctional Center in West Palm Beach; 4) St. John Juvenile Correctional Center in St. Augustine; 5) St. Johns Youth Academy in St. Augustine; 6) Marion

Juvenile Correctional Facility in Ocala; 7) JoAnn Bridges Academy in Greenville, and 8) Santa Rosa Youth Academy in Holt.

19.     YSI holds itself out as the "premier provider in the Youth Care Industry of educational and developmental services that change, dramatically, the thinking and behavior of troubled youth."

20.     YSI's company mission "is to protect the public by building and operating safe and humane facilities where young men and women receive training, education and treatment designed to help reduce the likelihood of reoffending after their release."

21.     Defendant JFS Development, LLC, is a corporation organized under the laws of the State of Delaware with its principal place of business at 6000 Cattleridge Drive, Suite 200, Sarasota, Florida 34232.  JFS Development is a holding company and is the parent company of its wholly owned subsidiary company, Defendant Youth Services International, Inc.

22.     Defendant James Slattery ("J. Slattery") is the President of Youth Services International, a private, for-profit corporation that contracts with DJJ to operate juvenile correctional facilities, which included Thompson Academy.

23.     Under the terms of the contract executed by DJJ and YSI, YSI is responsible for overseeing the daily operations and to provide a safe environment at all of its facilities and to operate the facility in compliance with state and federal law.

24.     Defendant Michael Slattery ("M. Slattery"), is the son of James Slattery, and a Regional Vice President and officer in YSI, and was responsible for overseeing the Administrator at Thompson Academy.  M. Slattery is also a facility trainer and former Youth Counselor.

25.     Defendant Christopher Slattery ("C. Slattery"), is the son of James Slattery, and as the Vice President of Human Resources and Support Services at YSI, oversaw the retention, training, and supervision of Thompson Academy's Administrator.  Prior to becoming a vice president at, Mr. Slattery worked for a short time as a Quality Assurance Specialist where he learned how to create documentation which allows YSI to pass Quality Assurance Audits and achieve deemed status.  Christopher Slattery graduated from Florida State University in 2009 with a major in criminology.

## JURISDICTION AND VENUE

26.     The Plaintiffs' cause of action arises under the Prison Rape Elimination Act of 2003 (PREA), and the Fourth, Eighth, and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

27.     Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and § 1343(a).  This Court has jurisdiction under 28 U.S.C. § 1367 over Plaintiff D.M.'s state law claims, as they are so related to the federal claims in this action that they form a part of the same case or controversy under the Constitution and laws of the United States.

28.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim[s] occurred" in this district.

## STATEMENT OF FACTS

### Violation of Plaintiff D.M.'s Right to Protection from Harm

### General Allegations

29.     YSI alleges that it provides strong corporate oversight to all of its facilities.

30.     YSI alleges that no program operates in isolation, and are fully supported by the corporate management team "to ensure compliance and excellence well beyond minimal standards".

31.     In their response to DJJ's Request For Proposal (RFP) on contract 2085, YSI committed to provide Continued Management Control to Thompson Academy (TA), stating "TA will receive ongoing regular oversight by corporate management and quality assurance teams to ensure the program runs smoothly and is in compliance with all applicable rules and standards."

32.     YSI failed to provide Continued Management Control to Thompson Academy.

33.     The Program Administrator's job is to provide on-site management of the program with local staff support along with guidance and oversight of the corporate management team.

34.     The Program Administrator and QA team receive oversight through a weekly conference call with the Florida Regional VP and a monthly call with the Sr. Vice President and Executive Management Team.  These calls review all issues related to the control and performance of the facility.

35.     In addition, corporate senior management is supposed to conduct unannounced site visits to the facility on a monthly basis.

        YSI committed to be fully aligned with DJJ's expectation for public safety.

36.     On October 23, 2009, YSI submitted their response to RFP #2085 - 154-Bed Moderate Risk Residential Program for Boys.  In YSI's proposal to the State of Florida, it states "YSI's corporate management team is nationally recognized leaders with an average of 28 years in the juvenile justice field."

37.     As their contract with State of Florida DJJ states, YSI is obligated to follow the rule: "All reportable incidents are defined in Florida Administrative Code Rule 63F-11, are

required to be called into the CCC within 2 hours of the incident occurring or program staff learning of the incident."

38.     Based on its representations and promises, including to provide strong corporate oversight and utilize all this institutional knowledge, YSI was awarded a contract totaling $14,815,831.80 to manage Thompson Academy.

> **YSI hired Thompson Academy's Director from Georgia Department of Juvenile Justice and failed to heed any of the Georgia DJJ's 'red flags' found in his personnel file.**

39.     The Administrator and Program Director at Thompson Academy, Renza Craig Ferguson ("Administrator") was hired by YSI in December 2009.

40.     During his employment with Georgia DJJ, his personnel record reflected strong warning signs about Ferguson's lack of honesty and lack of trustworthiness that YSI did not heed.

41.     Other notes in Ferguson's personnel record reflected questions about his ability to properly and respectfully lead.

**Prior to DM being admitted to Thompson and molested by the Administrator, YSI had knowledge the Administrator was not fit for his position and neglected its duty to investigate, supervise, and train despite multiple alarming incidents.**

> **YSI failed to investigate, manage, train, and supervise Thompson Academy's Administrator.**

42.     As Administrator of Thompson Academy, Ferguson exercised administrative control of and responsibility for Thompson Academy.  He was responsible for day-to-day operations of the facility and supervise all conditions and practices therein.

43.     Ferguson was directly responsible to set the culture for, supervise, hire, fire, and oversee the management and all staff at Thompson Academy.

44.      Ferguson was given unbridled power by Defendants, and Defendant's silent approval of his behavior and his harmful relationships with boys, by way of inaction and willful ignorance, contributed directly to the harm suffered by D.M..

Three months into his tenure, Ferguson developed an inappropriate relationship with youth D.B.

45.      In 2010, Ferguson carried out an inappropriate relationship with Youth D.B.

46.      Ferguson arrived at the facility late at night and removed D.B. from his sleeping quarters to provide him with late night meals in his office.

47.      Ferguson would remove his own shoes and rub lotion on his own feet in D.B's presence.

48.      Ferguson provided gifts to D.B. including snacks, body soaps, and an iPod with downloaded music.

49.      Ferguson would brush the back of his hand against D.B.'s buttocks when passing him in the hallway.

50.      Ferguson tried to provide D.B. with his personal contact information upon his release from the facility.

51.      Ferguson's inappropriate relationship with D.B. was known throughout the facility.

52.      YSI never investigated Ferguson's inappropriate relationship with D.B..

53.      Despite being an extremely neat, tidy, and meticulously organized man, Ferguson would frequently arrive at the facility at 1:00 a.m. and take individual children from the dormitories to "file papers".

**If YSI investigated Thompson's Administrator or had a functioning open door policy, they would have learned of the Administrator's inappropriate relationships with multiple troubled boys.**

54.     Youth D.L. was known in the facility for spending alone time in the Administrator's office. (Due to the victims being minors, initials are used to protect their privacy and full names will be provided to opposing counsel under separate, confidential cover.)

55.     Youth D.H. special privileges, including being alone in the Administrator's office in the evening.

56.     Youth T.T. was known in the facility as having special privileges and was taken off property by Ferguson.

57.     Youth K.P. was known in the facility as having special privileges from Administrator Ferguson, but when he fell out of favor with Ferguson, the Administrator had K.P. locked in isolation for several weeks.

58.     Youth M.W. was known in the facility as having special privileges in the facility and would threaten to have Ferguson fire any staff that tried to discipline him.

59.     Despite Program Rules, several of the above listed youth were generally allowed to walk around the facility without shirts.

60.     Staff were not empowered to discipline these 'select' youths.

61.     If the youth crossed Ferguson, or disobeyed him, they ran the risk of being placed in isolation or worse, having their stay extended.

**Within three months of beginning his tenure, Ferguson began to psychologically dominate the youth, and as a result the facility received a Major Deficiency Warning from DJJ.**

62.     On February 5, 2010, at the prompting of Public Defender Gordon Weekes, DJJ conducted an investigation and discovered Ferguson was requiring newly admitted orientation youth to sleep on the floor without mattresses for the first 72 hours after orientation.

11

63.     The Department of Juvenile Justice had to explain to Administrator Ferguson that as per Rule 63E-7 and contract R2085, it is a requirement that all children at Thompson Academy are to be designated to a bed.

64.     Georgia DJJ, where Ferguson was trained, does not require children to sleep on the floor at any time while under their care.

65.     This incident occurred during the transition of Thompson Academy's new leadership team; a time during which YSI Corporate Management represented there would be close guidance and supervision from the Corporate Management Team.

**The sexual assault of youth D.B. in February 2010 is not reported to DJJ, and YSI ignores its duty investigate, train, or supervise the Administrator.**

66.     In February 2010, youth D.B. alleged that he had been sexually abused by an employee at the facility and while out on transport.

67.     Assistant Facility Administrator Antwoyn Carter informed Administrator Ferguson.

68.     Case Manager Barbara White was also informed of the assault, completed a written report and physically handed the report to Dr. Ferguson.  Ms. White provided this information in sworn testimony to the Pembroke Pines Police Department and the Office of the Inspector General.

69.     YSI, J. Slattery, M. Slattery, and C. Slattery, and the entire Corporate Management Team neglected to speak with Ms. White concerning her February 2010 sworn testimony that Ferguson was not being forthcoming as to when he learned about D.B.'s sexual assault allegation.

**[SPACE INTENTIONALLY LEFT BLANK]**

Ferguson promotes Latoya Jackson as a reward for covering up YSI's failure to report abuse.

70.     In February 2010, Floor Supervisor Latoya Jackson was informed by Ms. White about D.B.'s sexual assault allegation.

71.     When she learned of the incident in February 2010, Ms. Jackson did not meet with the victim to get more details.  Ms. Jackson did not complete a written statement.

72.     In October 2010, when DJJ investigated and asked why Ms. Jackson failed to investigate, she stated she "was not thinking".   Ms. Jackson was promoted by Administrator Ferguson without objection by YSI.

73.     Ms. Jackson was ultimately promoted to Assistant Program Administrator.

74.     As an Assistant Program Administrator, Ms. Jackson's salary almost doubled from her previous salary and she was paid $5043.51 per month, an annual salary of $60,522.00.

In March 2010, Administrator Ferguson starts a campaign of harassing and defaming Dr. Bliss.

75.     Approximately four months after Ferguson started his tenure at Thompson Academy, Ferguson called Dr. Bliss into his office to reprimand her.

76.     Dr. Ferguson had present in his office several supervisor level employees, as well as employees from the Behavior Health department, and accused Dr. Bliss of keying a car that was parked in her customary parking spot.

77.     Dr. Ferguson threatened to call the police and then advised her that the only person with an assigned spot at Thompson Academy was him.

78.     Dr. Ferguson continued to harass and demean Dr. Bliss throughout the rest of her time at Thompson Academy, and YSI and the Slatterys did nothing.

79.     YSI received official warning on May 7, 2010 that Thompson Academy was in disarray.

80.     Five months after Ferguson's tenure began, DJJ conducted an unannounced, non-traditional on-site visit to monitor youth supervision and staff interaction and discovered that staff was not properly dressed and had various attire such as "doo-rags (head scarves), hats, sweats, etc.".  The State indicated that it was difficult to identify staff from residents.

81.     The State indicated that youth boxers and undergarments were showing, and clothing was not being worn properly.

82.     The State identified violations of youth privacy in that case management files were improperly being reviewed during the course of outside activities.

83.     During "Fun Day," it was observed that much youth movement was taking place and there were not enough staff members positioned correctly.

84.     Youth "Pat Downs" were not conducted after youth movement from area to area.

85.     The State identified multiple safety and privacy violations in 2010.

86.     YSI neglected their duty to provide greater oversight over  Thompson Academy or additional training for Ferguson after the discovery of these troubling violations.

<u>Ten months into Ferguson's tenure, attorneys from the Southern Poverty Law Center<br>were prevented from meeting with youth at Thompson Academy.</u>

87.     On or about September 8, 2010, the Broward County Public Defender, and several parents, requested that Southern Poverty Law Center ("SPLC") legal staff visit their children due to concerns about conditions at Thompson Academy.

88.     The Southern Poverty Law Center, based in Montgomery, Alabama since 1971 is a nonprofit civil rights organization dedicated to seeking justice for the most vulnerable members of society. The SPLC seeks to protect imprisoned children and teens from abuse and safely reduce the number of imprisoned children.

89.     After SPLC attorneys visited their clients at Thompson Academy, Administrator

14

Ferguson and staff began questioning youth about their confidential attorney-client meetings with SPLC.

90.     Administrator Ferguson discouraged youth from meeting with SPLC attorneys.

91.     Administrator Ferguson pressured a number of youth to sign or write statements stating  that they no longer wanted to meet with the SPLC.

92.     Ferguson punished youth by extending their sentence if they would not sign such statements.

93.     On September 29, 2010, Administrator Ferguson retaliated against a youth for exercising his First Amendment rights by extending his stay at Thompson Academy.

94.     On September 30, 2010, Administrator Ferguson and staff prevented the Southern Poverty Law Center from visiting with their clients, and presented the youths' letters that they were declining legal representation.

95.     On September 30, 2010, the SPLC sent a letter to DJJ describing the inability of youth to make confidential phone calls to attorneys, Ferguson's unlawful interference with youths' rights to access the courts, and Ferguson's attempt to procure statements from youth waiving their right to speak with an attorney.

96.     On October 8, 2010, the Southern Poverty Law Center (SPLC) filed a federal lawsuit directly related to Ferguson's administration and leadership at Thompson Academy.

<u>Thompson Academy and YSI's Corporate Management Team failed to report abuse allegations to the Department of Juvenile Justice.</u>

97.     Upon receiving notice of the SPLC's lawsuit, YSI's corporate management team failed to report the incident to the State of Florida within the required two hours, and took no action at all to intervene or investigate the Administrator at Thompson Academy.

98.     On October 11, 2010, Residential Services Regional Administrator Lois Salton notified the Department of Juvenile Justice Office of the Inspector General (OIG) and Central Communications Center (CCC) of the allegation that a staff member sexually assaulted a youth in January or February 2010.  During the investigation, Salton advised OIG staff that program staff knew of the allegation but failed to report the information to the CCC as required.

99.     Administrator Ferguson never reported the incident to the State of Florida, and in sworn

testimony denied any knowledge of the assault until a lawsuit was filed in October 2010.

100.    As a result of the Southern Poverty Law Center's efforts and diligent investigation, investigations were carried out by the State of Florida and City of Pembroke Pines into allegations of sexual assault.

101.    Pembroke Pines Police Department opened an investigation into Thompson Academy.  The Agency Report Number is 2010-085371.

<u>In October 2010, Ferguson acknowledges three unreported incidents of sexual abuse and YSI still does not act, investigate, train, supervise, or fire Ferguson.</u>

102.    On October 13, 2010, Administrator Ferguson stated to Detective Soubasis of the Pembroke Pines Police Department "that this is the third time this victim has alleged sexual abuse".

103.    Ferguson's sworn statement implies that the first two episodes of abuse referred to by Ferguson were known by Ferguson, yet never reported by him.

104.    Ferguson's revelation of this knowledge failed to trigger any reaction from YSI corporate management to train, supervise, or fire Ferguson, or to investigate  his background with due diligence.

105.    Had YSI Investigated Ferguson more thoroughly given his conflicting testimony and the events of his first 12 months, they would have learned Ferguson has a propensity to omit key facts and is not forthcoming with negative information reflecting his performance based on documentation from his Georgia DJJ personnel file.

106.    Had YSI investigated Ferguson more thoroughly at this point, as they were obligated to do, they would have learned that twice, in his employment past, he tried to hide a job from Georgia DJJ where he worked with children and was fired.

107.    Had YSI learned of Ferguson's inability to be forthcoming with difficult facts, they would have been able to take steps to protect the youth under Ferguson's care.

108.    Ferguson attempted multiple times to silence the children at Thompson Academy and shut down the Southern Poverty Law Center's investigation, including one episode where he literally physically blocked youths' attorneys at the facility's door.

109.    YSI again failed to train, investigate, supervise, or place any policy that could have exposed and prevented further abuse at the hands of the Administrator, and taken steps to prevent violations of the children's constitutional rights.

**One Month After YSI received the SPLC lawsuit and learned how dangerous and incompetent Ferguson was as the Administrator, Plaintiff D.M. was admitted to Thompson Academy**

110.    D.M. was born February 21, 1994.  He was 16 years old when he entered Thompson Academy.

111.    Plaintiff was ordered by Judge Ehrlich to his first residential program, Thompson Academy, and he began the program on November 22, 2010.

112.    Upon being admitted to Thompson Academy, D.M. was screened, evaluated and classified by sexual aggression or vulnerability to victimization, special needs including mental, developmental, or intellectual disabilities, a history of violence, and sexually transmitted disease.

113.     At the time he was molested and/or sexually abuse by the Administrator at Thompson Academy, he was 16 and 17 years old.

114.     At all times relevant to this action, and currently, D.M. has been diagnosed as having, at most, borderline intelligence with an IQ between 70-79.

115.     D.M.'s mother was very concerned about D.M. at Thompson Academy because she was told by the program that he was exhibiting physical aggression at the program.

116.     D.M.'s mother would visit her son and bring him gifts, however, as D.M.'s stay at Thompson continued D.M. informed his mother that she did not need to bring him gifts because the Administrator gave him everything he needed.

117.     D.M.'s mother attempted to visit her son on at least two occasions and was turned away by the facility.

118.     Gifts D.M. received from the Administrator included clothes, toiletries, sneakers, food, pastries, and a rosary.

<u>Investigation into D.B.'s abuse allegation roll into 2011, but YSI's does not investigate their internal failures.</u>

119.     On January 4, 2011, Detective Soubasis finalized his Incident Report and recordings of interviews.  All such documents are public record.

120.     YSI did nothing in response to Detective Soubasis's investigation.

121.     In January 2011, DJJ had implemented a freeze at the Program and was not sending new youth to the facility, just a couple of short months after D.M. was admitted to the Program.

122.     On January 12, 2011, Vice President Michael Slattery visited Thompson Academy, but he did not speak with Case Manager White  who was still employed at Thompson Academy or any other hourly employee  at the time of his visit.

In February 2011 Administrator Ferguson loses access to Florida's DJJ systems due to inactivity.

123.     The Residential Services Management System (RSMS) is a web-based component of JJIS and software application designed to store information pertaining to each residential commitment program's performance that, in the case of a contracted program, reflects the program's compliance with their contract terms and conditions.

124.     It is highly unusual for a Administrator's access to be shut off due to inactivity because the RSMS is an essential tool for any competent abiding Administrator to do their job.

125.     On February 24, 2011, Craig Ferguson's RSMS access was reinstated after acounseling with Laurie Workman.

Southern Poverty Law Center and YSI enter into mediation talks in April 2011

126.     Mediation talks began approximately in mid-April 2011 and were concluded on May 10, 2011.

127.     On May 11, 2011, due to a confidential settlement agreement agreed to by YSI, the Court dismissed the case.

YSI renovated Thompson Academy starting in April 2011

128.     YSI incurred costs of $440,000 associated with Thompson Academy improvements made after the SPLC's lawsuit.

129.     Youth participated in renovating the facility and painting over mold.

130.     The administration area was renovated which resulted in the Program Administrator's office becoming more isolated, more private, and less accessible to employees wanting to use the company's "open door policy".

131.    After completion of the renovation, the side door next to the Administrator's still did not include an alarm or a camera, in effect giving the Administrator a secret way to enter and exit the facility.

132.    YSI's Corporate Management knew about and permitted the Administrator to continue to have an unalarmed side door.

**On Easter Sunday 2011, Ferguson took three youth out of the facility and molested D.M.**

133.    On Easter Sunday, April 24, 2011, Administrator Ferguson ordered three children to his office.

134.    Youth Counselor Jenkins retrieved the boys from their beds, handed them the nice Church clothes gifted to them by Ferguson, and then they were released to Ms. Tiffany Williams.

135.    Ferguson allowed the three youths to change their clothing before leaving the facility.

136.    Ferguson admits to taking the children to Walmart the previous day to buy them new clothes.

137.    Ferguson never called D.M.'s parents for permission to buy them gifts or to remove them from the facility.

138.    No documentation exists demonstrating that any of three children were granted approval to go with Ferguson on Easter Sunday 2011.

139.    The facility is required to document all calls to parents in the telephone log and none were documented for this occasion.

140.    Ferguson parked his Mercedes Benz immediately outside the facility's unalarmed side door that was directly adjacent to his isolated office.

141.     Ferguson took the three children through the unalarmed side door of the facility to his waiting car.

142.     Plaintiff, a reported Level 3 at the facility, and two other children were taken by Ferguson to:

    a.   Antioch Mission Baptist Church in Carol City;

    b.   a mall parking lot where pictures of the children posing on the car were taken;

    c.   Denny's;

    d.   a car ride, and;

    e.   a two story townhouse.

143.     Only children who have obtained a Level 4 were permitted to be rewarded with off property trips, and only after obtaining parental consent.

144.     Plaintiff D.M. was not well behaved at Thompson Academy, and was in at least six physical altercations with youth or staff, and did not understand why he was being given special privileges.

145.     While at Antioch Mission Baptist Church in Carol City, Ferguson instructed the youth not to speak with anyone as he introduced the boys to a Bishop, and called them "his children."

146.     After Church, Ferguson drove the boys around for a while, went to the mall and took pictures of the boys posing on his Mercedes Benz, and took them to Denny's for lunch.

**D.M. was assaulted by Ferguson in the Denny's restroom.**

147.     While at Denny's, Plaintiff excused himself to use the restroom.

148.     a couple of minutes later, Ferguson followed Plaintiff into the bathroom.

149.     Plaintiff was washing his hands when Ferguson entered the restroom.

150.   In the bathroom at Denny's, Ferguson approached Plaintiff from behind and pressed his body against him and wrapped his arms around Plaintiff "to help him wash his hands".

151.   Plaintiff loudly protested, wrestled Ferguson off of him, and said he could wash his own hands without help.

152.   D.M. then ran from the bathroom and returned to the table with the other two boys. Distraught, upset and confused, he waited with the other two boy for Ferguson to return.

153.   Ferguson drove the boys around in his Mercedes and then took the three boys to a townhouse.

154.   Plaintiff was suspicious of Ferguson at this point because of his advances in the bathroom.

155.   Plaintiff was also warned by staff members Blair, Warren, and Clark that Ferguson was homosexual and wanted "something" from Plaintiff, so he did not proceed beyond the first room of the townhouse.

156.   Had M. Slattery, J. Slattery, and C. Slattery had a genuine open door policy or investigated Ferguson during his first year, they too would have known what Thompson's employees and children knew - that Ferguson was a danger to boys in his care.

157.   Ferguson and the other two boys went upstairs in the townhouse where they stayed for approximately 60 minutes.

158.   Upon returning to the facility, the two youth who went upstairs told employees stories about going to "Doc's house".

<u>Ferguson spent much energy and time grooming Plaintiff D.M.</u>

22

159.   D.M. was lured to Ferguson's late at night with food and gifts while the other children were allowed to be asleep in their dormitories.

160.   While secluded alone in Ferguson's office with him late at night, Plaintiff was inappropriately touched and photographed by Ferguson.

161.   Plaintiff did not feel that he had any power or was in a position to resist or protest against spending alone time with Ferguson.

162.   Ferguson would remove his shirt and sit directly next to Plaintiff at the conference table in his office, and touch him on his back, shoulders, and thighs.

163.   If Plaintiff protested, Dr. Ferguson would get upset and irritated with Plaintiff, and send him back to his bed.

164.   Ferguson would apologize, remorseful, and reconcile with Plaintiff by bringing more food for him a couple of days later.

165.   D.M. received multiple privileges in the facility, and the staff knew about the Administrator's affinity for the boy.

166.   Plaintiff D.M. was told by youth P.M., who also received preferential treatment from Ferguson, that he should refer to Ferguson as "Daddy."

<u>One month after taking kids home with him, Assistant Facility Administrator Jean Claude was scapegoated by Ferguson and demoted, and Bo Rogers was promoted.</u>

167.   After several short weeks of employment as a floor supervisor, Bo Rogers was quickly promoted to Unit Manager, and then two weeks later was promoted to Assistant Facility Administrator.

168.   It was widely believed that the Administrator and Assistant Facility Administrator had

an inappropriate, relationship - where the Assistant Facility Administrator was able to 'win over' the Administrator and quadruple his salary based on his submissiveness to Ferguson, physique, and tight pants.

<u>In September 2011, YSI learned Ferguson took youth home with him and did nothing.</u>

169.    Kamel Warren informed YSI that the Administrator was a potential pedophile.

170.    On October 1, 2011, YSI received an EEOC sexual harassment complaint from Kamel Warren, a former employee.

171.    Kamel Warren sent a copy of his 4 page sexual harassment complaint against Dr. Ferguson to YSI's corporate office in Sarasota.

172.    In Kamel Warren's letter to YSI, he stated: "He (Ferguson) hid a lot of things from investigators and lawyers.  He has taken kids to his house and church with him. He bribes kids and staff. He came on to staff members…"

173.    On October 13, 2011, Vice President Michael Slattery visited Thompson Academy to investigate Kamel Warren's sexual harassment complaint against Ferguson.

174.    Vice President Michael Slattery acknowledged to Augustin Farouto that he knew of the allegation of Ferguson taking children home with him, but he did not investigate or report the allegation to DJJ.

175.    Vice Presidents M. Slattery has provided a sworn statement he was aware in October 2011 of the report that Ferguson took children home with him Easter 2011.

176.    Vice Presidents C. Slattery has provided a sworn statement he was aware in October 2011 of the report that Ferguson took children home with him Easter 2011.

177.    Neither YSI, Slattery, or anyone on the Corporate Management Team made a report to DJJ about Warren's allegations that Ferguson took children home with him.

178.    YSI did nothing to investigate until the incident was officially reported in March 2012, almost one full year after the incident.

179.    YSI has created false internal documentation stating they first learned of the Easter 2011 incident in March 2012 when the incident was reported to the CCC.

One months later, just before Quality Assurance, the second in charge at Thompson, Dr. Bliss, was forced to resign.

180.    In 2011, Dr. Bliss's Choices program only had 2 incidents occur while the overall Program reported a near record high 47 incidents.

181.    After a long campaign of discrediting, demeaning, and attacking Dr. Bliss, Administrator YSI's Corporate Management Team forced Dr. Bliss to resign.

182.    Vice President Jesse Williams went to Thompson Academy and removed Dr. Joann Bliss, and did not investigate Kamel's claim about the Administrator taking children home with him.

183.    YSI then misrepresented the date and terms under which Dr. Bliss left Thompson Academy.

184.    Dr. Bliss was terminated one month prior to DJJ's 2011 Quality Assurance visit.

November 2011 Quality Assurance Review

185.    Multiple signs that the Administrator of Thompson was a serial liar and produced fraudulent documents were willfully ignored by YSI so as to not compromise their ability to acquire Deemed Status and obtain more contracts from the State of Florida - especially renewal of the $30 million West Palm contract that was slated to occur in early 2012.

186.    In November 2011, Thompson Academy reported to the Quality Assurance Review Team that all staff had exceeded the in-service training requirements by averaging an

additional fifty hours of documented training, along with fifteen hours of staff training that was not officially documented as training.

187.    Despite this excessively large number of training hours dedicated to each staff, none of the employees' paychecks indicated that any, let alone any additional, training hours were conducted at Thompson Academy.  This discrepancy should also have been specifically noticed by C. Slattery, head of HR, and J. Slattery who was extremely cost-cutting in his practices.

188.    No additional staffing was at the facility that would have allowed the facility to remain in ratio while all this extra training was taking place.

189.    In addition, numerous staff will testify that Administrator Ferguson did not permit staff to go to training, and they were required to sign off that they did attend the training or be fired, a practice endorsed by Michael Slattery.

190.    Despite these incredible anomalies, YSI, C. Slattery, J. Slattery, and M. Slattery failed to take any notice or to investigate Ferguson and the methods he was using to run the facility.

191.    Administrator Ferguson came to understand YSI and the Slattery's negligent, indifferent attitude to complaints, and the incompetent investigations and deliberate cover ups that followed any complaint, as express permission to run the facility so that it catered to his needs, not the requirements of YSI's contract with DJJ or the needs of the children.

192.    The result was the continued endangerment of children entrusted to YSI's care by DJJ.

193.     After receiving actual written notice that the Administrator was a danger to children and likely pedophile, YSI failed to report this to DJJ or the CCC, and left his victims to suffer.

194.     After reoffending in November 2011, (in part because no effective treatment was provided by YSI), and upon being informed that he was going to be placed back in a residential program, D.M. ran away from home.

195.     Despite the gifts, clothes, food, and special privileges D.M. received, and his 'success' in the program, D.M. was so scared to return to a DJJ facility he ran away from home and only turned himself when his mother said she was going to have to go to jail instead of him if he stayed away.

<u>But for YSI's intentional actions and grossly negligent failures,
D.M. would not have initially been harmed, nor would his suffering have continued.</u>

196.     Had YSI properly trained and supervised Ferguson, and investigated allegations and clear proof of wrongdoing, YSI and Slattery could have prevented Plaintiff from ever being harmed by the Administrator at Thompson Academy

197.     Had YSI and Slattery investigated Kamel Warren's letter, they would have learned about Ferguson's inappropriate relationship with D.M. and reported the potential abuse to the State, and prevented further harm on D.M. and multiple other youth.

198.     YSI chose to do nothing, nothing to help the victims, nothing to advise the State, and nothing to prevent Ferguson from victimizing additional boys.

## <u>COUNT I</u>

### CIVIL RIGHTS VIOLATION BY
### YSI, JAMES SLATTERY, MICHAEL SLATTERY, AND CHRISTOPHER SLATTERY

199.    Plaintiff realleges and reavers paragraphs 1 through 196 as if fully set forth herein and further state that this is an action under 42 U.S.C. § 1983 against all Defendants.

200.    At all times relevant to this Complaint, Defendants J. SLATTERY, M. SLATTERY, and C. SLATTERY as corporate officers and employees of YSI and JFS HOLDING  LLC, were acting under the direction and control of Department of Juvenile Justice and State of Florid regulations.

201.    Acting under color of law, M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC negligently failed to instruct, supervise, control, and discipline on a continuing basis, Administrator Ferguson in his duties to refrain from (1) unlawfully and maliciously touching children; (2) unlawfully using his power to unlawfully influence staff and youth; (3) unlawfully and maliciously place children in isolation for disobeying him; (4) failing to report abuse and other allegations; (5) brining children to his office late at night; (6) photographing the children without clothing; (7) taking them to his home and buying them gifts and meals; and (8) prohibiting employees and youth from making abuse reports to the CCC.

202.    Defendants purposefully created a culture where abuse is not reported as mandated by state law.

203.    Defendants have a de facto policy of allowing Administrators to show a deliberate indifference to troubled children entrusted to YSI when they must decide between profit and the consequence of reporting an incident, which was the ultimate motive behind the deprivation of Plaintiff's constitutional rights.

204.    Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC had (or should have had) constructive and had actual knowledge that the Administrator had previously and persistently committed the acts as described on D.M. above,

and, had they diligently exercised their duties to instruct, supervise, control, investigate, and discipline on a continuing basis, they should have had knowledge that the wrongs conspired to be done had taken place and were highly likely to continue to take place. Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI  and JFS Development, LLC all had the power to prevent or aid in the prevention of the commission of said wrongs, could have done so by reasonable diligence, and grossly and recklessly neglected and refused to do so.

205.    Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI  and JFS Development LLC had the authority and were required by statute of, regulation of,  and contract with the State of Florida and Department of Juvenile Justice to exercise due diligence to instruct, supervise, control, train, investigate, and discipline on a continuing basis, Administrator, and said M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC intentionally or recklessly failed to perform such duties as required by state law or municipal ordinance.

206.    Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC directly and indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Thompson's Administrator already described above.

207.    The constitutional deprivation was caused by Defendant YSI's numerous areas of deliberate and willful indifference as outlined in 1 through 196 above including

      a.    custom of condoning alleged instances of failure to report and failure to document.  Officers in YSI are secure in knowing that a reported incident will be stale and unsubstantiated due to untimely reporting and a custom of terminating the employment of any employee involved so as to prevent a diligent investigation by DJJ. YSI condoned the Administrators action when

they ignored multiple clear warning signs that the Administrator at Thompson Academy was grooming troubled boys.

b.   Defendant YSI permitted and tolerated the practice of failing to report incidents, keeping unofficial logs of troublesome events, and terminating (rather than training)  employees involved with a DJJ investigation

c.   Failure to have employees appropriately trained in mandatory reporting of suspected abuse, and permission for Thompson's Administrator to use any means necessary, including widespread fraud, to achieve deemed status. These failures lead to constitutional violations being perpetrated upon the inmates.

d.   Failure to heed multiple warnings by DJJ, the SPLC, and the Public Defender's Office that cumulated to the Administrator feeling empowered to bring boys back into his office late at night, on car rides, and home with him.

208.   Defendants administer their program with systemic failures designed to interfere with the administration of clear policies, customs and practices.

209.   As a direct, natural, proximate, and foreseeable result of the grossly and reckless negligent and intentional acts of Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC, D.M.'s constitutional rights were violated and he suffered and continues to suffer emotional pain, physical anguish. suffering , mental anguish, loss of enjoyment, and other non-pecuniary losses.

210.   As a direct, natural, proximate, and foreseeable result of the grossly and reckless negligent and intentional acts of Defendants M. Slattery, J. Slattery, and C. Slattery, and YSI and JFS Development LLC, D.M. was deprived of his right to equal protection of the laws and

impeded the due course of justice, in violation of the Fourth, Eighth, and Fourteenth
Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

211.    The actions alleged above have caused, and continue to cause, irreparable harm to
D.M., for which there is no full, complete or adequate remedy at law.

212.    D.M. is entitled to recover and litigation expenses pursuant to 42 U.S.C. § 1988.

213.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory
damages, pain and suffering, punitive damages, together with interest, and costs and fees, and
any other relief this Court deems just and proper.

## COUNT II

### NEGLIGENT HIRING & NEGLIGENT RETENTION AGAINST YSI, JFS HOLDING, MICHAEL SLATTERY, AND CHRISTOPHER SLATTERY

214.    PLAINTIFF repeats and realleges Paragraph 1 through 196, and incorporates
them by reference herein.

215.    Defendants have a duty to carry out an adequate pre-hire investigation, not hire
employees exhibiting unfitness for their position, train to fill weaknesses discovered in their pre-
hire investigation, and to heed warning signs discovered during the pre-hire investigation.

216.    Defendants are also charged with responsibility of adequately supervising its
employees to prevent them from either intentionally or negligently causing injury to the children
in their care due to their negligent hiring, retention or supervision of incompetent and dangerous
employees who have the likelihood and/or foreseeability of injuring third persons.

217.    Defendants' liability is based on the inadequacy of pre-employment investigation
into the employee's background and their failure to obtain available key information that would
allowed the corporation to gauge the honesty, forthcoming, and trustworthiness of the
Administrator.

31

218.   Defendant failed to conduct an appropriate investigation of employee and an appropriate investigation would revealed unsuitability of employee for particular duty to be performed or for the employment in general, and that it was unreasonable for employer to hire employee in light of information he knew or should have known.

219.   The cost of obtaining information about Administrator at Thompson Academy was not prohibitively expensive because the information is available for free from Georgia DJJ.

220.   Defendants failed to inquire into employee's background which they should have done given that he was the sole leader and Administrator at a boys facility.

221.   Failure to disclose information, and to be candid regarding matters of importance was a dangerous propensity of Thompson Academy's Administrator and YSI knew or should have known of, they would come into contact Plaintiff (and other boys like him), through Administrator's employment.

222.   When Thompson Academy's Administrator was hired, Defendants knew or should have known of the Administrator's unfitness to be blindly trusted, and it was not reasonable to permit employee to perform his job in light of information about employee which employer should have known.

223.   Employer judged employees employability upon single criterion of whether employee's capacity as an Administrator in Georgia was sufficient to satisfy employer's economic interest, rather than upon whether his character, conduct and mental condition insured safety of youth entrusted to Defendants.

224.   Defendants failed their duty to independently investigate Administrator for purposes of hiring and then retaining his employment.

225.     As a result of Defendant's conduct set forth in this Count, the Administrator's judgment and interpretation of events was never questioned, and the Administrator was able to dominate his staff into silence, charm his corporate handlers, and act as a twisted father figure type for boys susceptible to abusive relationships.

226.     The Administrator of Thompson Academy battered and molested multiple youth at Thompson Academy, including Plaintiff.

227.     Defendants breached their duty to exercise reasonable care in hiring employee.

228.     On or about December 2009, Ferguson became the Administrator of Thompson Academy working for Defendants.  Defendants hired Ferguson when it knew or should have known that Ferguson has had a questionable history with personal credibility on the job.

229.     Upon hiring Ferguson, Defendants knew or should have known the following:

    a.      Ferguson was fired from his first job working with teenagers;

    b.      Ferguson twice omitted this information from applications with Georgia DJJ;

    c.      Ferguson's explanation of the event is told three times to Georgia DJJ, and each time the story is a different;

    d.      Ferguson believed working with teenagers in 1999 was not relevant to a job applied for just four years later that he was applying for - working with teenagers.

230.     After being hired Ferguson immediately began developing inappropriate relationships with children, creating his own rules that directly conflicted with DJJ regulations, including making children sleep on the floor upon entering his facility and not enforcing dress codes.  Though these allegations and incidents were known by Defendants, Thompson's

Administrator was not disciplined, re-trained, supervised, or relieved of duty and continued to work for Defendants unabated.

231.    Ferguson was not put under additional scrutiny, rather he was allowed to terminate every authority figure in the facility that stood as a threat to him running the facility to suit his own desires.

232.    Ferguson provided sworn testimony he knew of sexual assaults that were not reported, but Defendants did not investigate why there was a breakdown in the reporting system, nor did Defendants re-train staff, or reinforce culture of reporting incidents to the State of Florida.

233.    Employees provided sworn statements contradicting when Ferguson knew about incidents of sexual assault at Thompson Academy, yet Defendants did not investigate.

234.    Ferguson allowed a sexual assault to go unreported, thereby allowing evidence to disappear and placing other residents to be at risk from the alleged perpetrator who continued to work at Thompson Academy. A fellow employee reported she provided Ferguson with reports of the sexual assault, and despite her sworn testimony to both the DJJ OIG and Pembroke Pines Police, Ferguson was allowed to continue being employed by Defendants and his employment proceeded unabated with no investigation, no substantive discipline, no retraining, no supervision, and no suspension.

235.    Defendants knew of Ferguson's incompetence and dangerousness. Defendants knew or should have known of the likelihood that this employee would injure a third person based on his conduct of downplaying and not reporting sexual abuse, demonstrated dishonesty and incompetence with staff, and questionable background and relationships with children.

34

236.    Defendants liability for negligent retention occurs after employment begins, and employer becomes aware or should have become aware of problems with employee that indicate his unfitness, but employer fails to take further actions, such as investigation, discharge or reassignment.

237.    Defendants are liable for negligent retention where employee and Plaintiff were in places where each had a  right to be when wrongful act occurred, where injured party met employee as direct consequence of his employment, and where employer would have received some benefit, even if only potential or indirect, from meeting of injured party and employee had wrongful act not occurred.

238.    Defendant breached their duty to exercise reasonable care in retaining Administrator despite multiple actual and constructive warnings of his dangerous propensities towards children in his care.

239.    Plaintiff suffered battery and molestation, and was the subject of inappropriate pictures taken at Thompson Academy by the Administrator.

240.    Defendants knew or should of known of the defendant's credibility issue and that such an issue  would reflect on whether or Ferguson would be able to perform his duty as a Administrator without any supervision or proper training.

241.    Defendants retained Ferguson in its employ knowing full well that there was a strong possibility Ferguson was engaging in inappropriate relationships with boys in the facility based on the lavish gifts he provided to Youth D.B. and multiple complaints filed by staff.   Yet Defendants did not undertake an aggressive investigation, or conduct any training, or provide additional supervision over Ferguson and consciously chose to place Ferguson, unchained, in charge of a 152 bed facility full of troubled boys.

242.    Had YSI conducted a proper investigation they would have learned of multiple acts of wrongdoing by Ferguson but they chose to intentionally ignore all warning signs.

243.    Defendants have a duty to provide competent, intelligent, responsible and trustworthy employees who are given the authority to influence the most troubled youth of today. The highest standard of care needs to be taken in order to ensure that the best and most competent personnel are allowed to work with these children, and effort must be taken to ensure the children in their care do not become the victim of a pedophile who is looking to develop his grooming technique in an institution of troubled youth.

244.    Defendants owe a duty to the public and D.M. to hire personnel who will not prey on children in their care.

245.    Defendants owe a duty to the public and D.M. to heed warning signs, based on their background check, of potential trouble with a new employee.

246.    By failing to heed obvious warnings that Defendants should have been aware of based on its duty to not be negligent in hiring, Defendants have breached the duty of care to D.M. and to the public which has caused injury in that D.M. was assaulted and suffered intentional infliction of emotional distress.

247.    As a direct and proximate result of the above-mentioned negligent acts of the Defendants, Plaintiff sustained physical injury, great bodily pain, and mental anguish, incurred legal expenses, deprivation of liberty.

248.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, pain and suffering, punitive damages, together with interest, and costs, and any other relief this Court deems just and proper.

**COUNT III**

## NEGLIGENT SUPERVISION OF MICHAEL AND CHRISTOPHER SLATTERY
## BY JAMES SLATTERY

249.    Plaintiff realleges and reavers paragraphs 1 through 20 as if fully set forth herein and further state:

250.    This is an action under the principles of Florida common law for negligent supervision against James Slattery.

251.    James Slattery had a duty to exercise reasonable care so as to control his employees, Defendants, Michael Slattery and Christopher Slattery, so as to prevent said employees from allowing reasonably foreseeable harm, such as the harm suffered by D.M.

252.    Defendants have a duty to supervise employees whose negligence or intentional acts in positions of employment can cause foreseeable injuries to youth in their care.

253.    James Slattery knew or should have known that he had the ability to control his employees, and knew or should have known of the necessity and opportunity for exercising such control - especially when an EEOC complaint alleges an Administrator may be a pedophile.

254.    James Slattery was negligent in his duties as CEO by failing to exercise the level of care which under all circumstances a reasonable prudent person would have exercised in supervising employees in Defendants, Michael Slattery and Christopher Slattery's positions.

255.    Defendant, Michael and Christopher Slattery, failed to take any action to prevent further harm by Thompson Academy's Administrator when they should have known, and then when they affirmatively knew, there was strong reason to believe Ferguson was a danger to children.

256.    Defendant, Michael and Christopher Slattery, failed to take any action to prevent further harm by Ferguson after they learned he took children home with him and lied to lawyers and investigators.

257.    Michael and Christopher Slattery actually gave the Administrator more power and autonomy after learning in October 2011 that the Administrator took children home with him, and when they knew he was a danger to children

258.    As a direct and proximate result of the above-mentioned negligent acts of the Defendant James Slattery, Plaintiff sustained physical injury, bodily pain, and mental anguish, incurred legal expenses, deprivation of liberty.

## [SPACE INTENTIONALLY LEFT BLANK]

259.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, pain and suffering, punitive damages, together with interest, and costs, and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury as to all issues so triable as a matter of right.

Dated: October 11, 2013

Respectfully submitted,

s/ Michael A. Hoffman
Michael Aaron Hoffman
Bar #89549
Michael@MAHlawyer.com
Michael A. Hoffman, Esq. PA
4000 Hollywood Blvd, #725-S
Hollywood, FL  33021
TEL: (954) 665-5290
FAX: (954) 944-1932
**Attorney for Plaintiff D.M.**